Cocheyse J. GRIFFIN, Mignon D. Griffin, Naja D. Griffin and L. Francis Griffin, Jr., infants, by and through L. Francis Griffin, Sr., their father and next friend, et al., Appellants,

v.

BOARD OF SUPERVISORS OF PRINCE EDWARD COUNTY and J. W. Wilson, Jr., Treasurer of Prince Edward County, State Board of Education of the Commonwealth of Virginia and Woodrow W. Wilkerson, Superintendent of Public Instruction of the Commonwealth of Virginia and County School Board of Prince Edward County, Virginia, and T. J. McIlwaine, Division Superintendent of Schools of said County, Appellees.

Avis M. PETTAWAY et al., etc., Appellees,

v.

COUNTY SCHOOL BOARD OF SURRY COUNTY, VIRGINIA, and M. B. Joyner, Division Superintendent of Schools of Surry County, Virginia, Appellants.

Avis M. PETTAWAY et al., etc., Appellees,

v.

BOARD OF SUPERVISORS OF SURRY COUNTY, W. E. Seward, Jr., Clifton M. Ellis, Jr., and J. A. Savedge, and A. T. Sowder, Treasurer of Surry County, Appellants.

---

Avis M. PETTAWAY et al., etc.,
Appellees,

v.

**STATE BOARD OF EDUCATION OF THE COMMONWEALTH OF VIRGINIA** and Woodrow W. Wilkerson, Superintendent of Public Instruction of the Commonwealth of Virginia, Appellants.

Avis M. PETTAWAY et al., etc.,
Appellees,

v.

Harvey J. BABB, R. Merrill Seward, Sidney G. Judkins and Lewis M. Berryman, individually and as the parent and natural guardian of children as named in their Motion to Intervene, individually and on behalf of said children, Appellants.

Nos. 9597, 9646–9649.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 4, 1964.

Decided Dec. 2, 1964.

William L. Marbury, Sp. Asst. Atty. Gen. of Virginia. (Robert Y. Button, Atty. Gen. of Virginia, R. D. McIlwaine, III, Asst. Atty. Gen. of Virginia, Frederick T. Gray, Sp. Asst. Atty. Gen., of Virginia, and Lewis A. Noonberg, Baltimore, Md., on the brief), for State Board of Education and Superintendent of Public Instruction of Commonwealth of Virginia, appellees in No. 9597 and appellants in No. 9648; S. W. Tucker and Henry L. Marsh, III, for appellants in No. 9597 and appellees in Nos. 9646, 9647, 9648 and 9649; and J. Segar Gravatt, Sp. Counsel (Wm. F. Watkins, Jr., Commonwealth's Atty. of Prince Edward County, on the brief), for appellee Board of Supervisors of Prince Edward County in No. 9597 and appellants Board of Supervisors of Surry County, its members, and A. T. Sowder, Treasurer of Surry County in No. 9647 (Ernest W. Goodrich, Commonwealth's Atty. of Surry County, on the brief), and counsel for appellants in No. 9649. John F. Kay, Jr., C. F. Hicks, Denny, Valentine & Davenport, and DeHardit, Martin & Hicks on brief for appellees County School Board of Prince Edward County, Virginia, and T. J. McIlwaine, Division Superintendent of Public Schools of Prince Edward County, Virginia, in No. 9597. John F. Kay, Jr., Counsel, and Denny, Valentine & Davenport, of counsel, on the brief, for County School Board of Surry County, its members, and M. B. Joyner, Division Superintendent of Schools, appellees in No. 9646.

Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.

SOBELOFF, Chief Judge:

Reaction to the decisions in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), has taken a variety of forms throughout the country. In the present appeals we are called upon to examine certain procedures adopted in two counties in Virginia—Prince Edward and Surry. Since the cases have common issues, they were consolidated for argument and will be considered together in this opinion.

I.

The early history of the Prince Edward County litigation is set forth in the Supreme Court's opinion in Griffin v. School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). By the summer of 1959, much of Virginia's "massive resistance" legislation had been invalidated by the Supreme Court of Appeals of Virginia as violative of the Constitution of the Commonwealth,[1] and simultaneously declared by a three-judge district court to be contrary to the Constitution of the United States.[2] The officials of Prince Edward County were then faced with an order of the District Court made pursuant to this court's direction that the County School Board be required to make plans for the admission of pupils without regard to race.[3] Rather than obey the order, the officials decided to close the county schools.

For five years the school doors did not reopen. The county made no provision whatever for the education of Negro children; white children attended segregated Foundation schools financed largely by state and county tuition grants to the parents.

The appellants in No. 9597 (Prince Edward County case) instituted their supplemental complaint on September 16, 1960, to enjoin the defendants from refusing to operate an efficient system of public free schools in Prince Edward County; from spending public funds for the direct or indirect support of private segregated schools; from spending public funds in aid of the attendance of any

1. Harrison v. Day, 200 Va. 439, 106 S.E. 2d 636 (1959).

2. James v. Almond, 170 F.Supp. 331 (E.D. Va.1959) (three-judge court).

3. Allen v. County School Board of Prince Edward County, Va., 249 F.2d 462 (4th Cir. 1957).

child at a private segregated school; from crediting any taxpayer for contributions to such schools; or from conveying public school facilities to any private party.

Pursuant to his opinion of August 23, 1961, District Judge Lewis issued an order on November 16, 1961, restraining the defendants "from approving and paying out any county funds purportedly authorized by the so-called 'grant in aid' ordinance," and "from allowing any tax credits purportedly authorized by the so-called 'tax credit' ordinance," during "such time as the public schools of Prince Edward County remain closed." The court further ordered that no application for state scholarships be processed "so long as the public schools" remain closed. Decision on the legality of the closing of the public schools was withheld to await the Virginia courts' determination of that question.

A year having passed without a resolution of this question, Judge Lewis on October 10, 1962, ordered that the county public schools be reopened. This order was affirmed on May 25, 1964, by the Supreme Court in Griffin v. School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

Promptly thereafter, on June 5, the parties were advised by Judge Lewis of his intention to enter a decree on June 17, 1964. He directed county and state officials to advise him by June 15 of preparations being made for the reopening of the county's public schools. The Prince Edward Board of Supervisors answered on June 15 that "it has not appropriated any funds * * * and does not intend to make such appropriation prior to the meeting scheduled with the court on June 17, 1964." The Supervisors also asked "advice with respect to the amount of local funds which the Court would deem appropriate."

Included in the Supervisors' answer was an inquiry as to the possible penalties for noncompliance.

In their response the County School Board informed the court that plans were being made to reopen the public schools for approximately 1600 pupils. The school age population, however, was over twice that number, 1600 being the approximate number of Negro children alone.

The scheduled hearing was held on June 17, and the Board of Supervisors was ordered to appropriate, by June 25, 1964, such "County funds as are reasonably necessary for the opening and maintenance of the public schools * * * on a non-discriminatory basis." The court refused to enter an order restraining the defendants from employing school personnel in a discriminatory fashion, taking the view that "the subject matter is clearly beyond the scope of the pleadings in this case."

The Board of Supervisors' response to the court's order to appropriate such funds as are "reasonably necessary" came on June 23, 1964, when it appropriated $189,000 to reopen and maintain the public schools expected to accommodate approximately 1600 Negro children. At the same meeting, the Supervisors allotted $375,000 for 1964–65 tuition grants for an approximately equal number of white students expected to attend "private" schools.

The plaintiffs, on June 29, moved the court to alter or amend its judgment of June 17, 1964, by permanently enjoining the processing of tuition grants, and specifically forbidding discrimination in teacher employment or assignment. They further requested the court to order the Supervisors to appropriate funds sufficient to reopen the public schools to *all* the children of the county on a nondiscriminatory basis.

Two days later, on July 1, the State Board of Education passed a resolution authorizing retroactive reimbursement to Prince Edward parents who had paid tuition for their children's attendance at private schools during the 1963–64 school year, when public schools were closed. This candid declaration by the State Board of its intentions in respect to 1963–64 tuitions naturally alarmed the plaintiffs. They requested an immediate

hearing on their motion or a temporary restraining order to preserve the status quo. The court fixed July 9 as the hearing date but declined to issue a temporary restraining order.

Fearing that the Board might pay out the money before July 9, the plaintiffs sought and obtained from Circuit Judge J. Spencer Bell an order on July 2 restraining the payment of retroactive grants "until this matter shall have been heard in the District Court at the hearing set for July 9, 1964, * * * and further until an appeal * * * from such order shall be heard in this court." On the date set for the hearing in the District Court, the defendants consented to a permanent injunction against the payment of either county or state tuition grants in reimbursement for tuition costs incurred during the 1963-64 school year. The District Court entered no injunction against payment of tuition grants for future years, being of the opinion that the Supreme Court's mandate did not compel the issuance of such injunction. As to that portion of the June 29 motion which pertained to the adequacy of the appropriation made for the public schools, the court postponed action until subsequent experience should reveal its adequacy or inadequacy.

Notice of appeal to this court was filed by the plaintiffs on July 17, 1964. They then moved to accelerate the appeal. The Court of Appeals not being in session, Judge Haynsworth, acting for the court, sought through our Clerk to obtain a stipulation from the defendants that they would pay out no scholarship grants pending the appeal. This request was conveyed by the Clerk to the office of the Attorney General of Virginia on August 4, 1964.

That night, in a specially convened meeting, the Prince Edward Board of Supervisors decided to increase the tuition grants for the ensuing year 1964-65 from a flat $100.00 per student to $290.00 for elementary school students and $310.00 for high school students. The Board's resolution offered no reason for this increase but stipulated that one-half of the total grants should be paid out *before* September 1, 1964. In previous years grants were withheld until after the Foundation schools had opened so that applications for tuition grants could be matched with enrollment records. In the course of the night, white parents were notified of the Board's action and individual checks totaling approximately $180,000 were distributed during the early morning hours. Most of these checks were cashed at 9:00 a. m. on August 5, 1964, upon the opening of the bank.

II.

Events in Surry County (cases Nos. 9646-49) have given rise to many of the same issues found in the Prince Edward case. Upon learning of the Supreme Court's first decision in Brown v. Board of Education in 1954, the county's Board of Supervisors and its School Board, like their counterparts in Prince Edward, passed a joint resolution expressing "unalterable opposition to integration of the races in the public schools to any degree, now or at any time in the future * *." This resolution is still in effect. No plans have ever been made to desegregate Surry's public schools.

Until the fall of 1963, Surry County operated three schools—Surry, an all white elementary and high school; New Lebanon, an all Negro elementary school; and L. P. Jackson, an all Negro elementary and high school. Only Negro teachers taught in the schools attended by Negro children; only white teachers in the school attended by the white children.

Not until June 24, 1963, did Surry County feel any effect from the Brown decision. On that date the State Pupil Placement Board assigned the seven infant Negro plaintiffs to the Surry School, theretofore attended exclusively by white elementary and high school pupils. The immediate reaction of the white citizens was to call a mass meeting to discuss ways of avoiding the effect of this order. Mr. Ernest W. Goodrich, Commonwealth Attorney, presided at this meeting, and

all three members of the Board of Supervisors attended.

At a later meeting, attended by two members of the Surry County Board of Supervisors and one member of the School Board, it was decided to establish a "private" school that would accept applications from white students only. The Commonwealth Attorney prepared the articles of incorporation for the Surry County Educational Foundation. He was named its registered agent and served on the original Board of Directors. The Treasurer of the county was also the treasurer of the Foundation.

The School Board sent out forms, prepared by the Foundation, to all white students for use in notifying the appropriate officials of any change of enrollment from public to "private" facilities. All of the white students applied for admission to the Foundation school, and all were accepted. Several Negroes likewise sought admission to the Foundation school, but their applications were all rejected. All white public school teachers resigned, and all were immediately hired by the Foundation. The School Board closed Surry School, giving as the reason "insufficient pupils to justify its operation." The seven Negro children previously assigned to that school were summarily returned to the Negro school.

When the public schools opened on September 5, 1964, the plaintiffs and all other Negro children of the county found themselves in segregated schools as before.[4] The only difference was that the white children were now in the Foundation school, and the doors of Surry School which they had theretofore attended were locked.

The annual tuition charged by the Foundation school is $375.00 for elementary and $389.00 for high school pupils. Toward this amount the parents pay only $125.00 for elementary pupils and $114.00 for high school pupils. State and county tuition grants aggregating $250.00 and $275.00 respectively are used to make up the difference.

The Surry County plaintiffs applied to Judge Butzner for relief similar to that sought in Prince Edward County from Judge Lewis. Upon virtually uncontroverted facts Judge Butzner issued an injunction restraining the defendants from paying scholarship grants for use in private segregated schools. This is the order from which the defendants appeal. Plaintiffs were held entitled to reasonable attorneys' fees, the amount to be determined later.

While the court passed no order enjoining discrimination in the employment of faculty and administrative personnel, it recognized the obligation resting on the authorities to plan for the removal of such discriminatory practices, citing the opinion of this court in Jackson v. School Board of the City of Lynchburg, Virginia, 321 F.2d 230, 233 (4th Cir. 1963).

### III.

In both appeals the program attacked by the plaintiffs was designed and has made it possible for these counties to continue to offer their school age population education at public expense on a segregated basis, in the teeth of the Brown decisions. The central issue is therefore the constitutionality of the use of public funds for such a purpose.

In the decade in which federal courts have been expounding the mandate of Brown v. Board of Education, they have again and again met and disposed of a variety of devices designed to stave off, if not to frustrate, the desegregation of public instruction. Prince Edward County's hard and bitter resistance included, as we have seen, the extreme step of shutting down all public schools for five years. Only under the direction of the Supreme Court has it reopened them,

---

4. Not only were they segregated, but the facilities furnished them were distinctly inferior to those available to white children. Classrooms were crowded and buses overloaded. No attempt was ever made to employ the building or bus facilities of the closed white school to alleviate the overcrowding of the facilities available to the Negroes.

and then only on its own terms—terms calculated still to preserve the segregation of the races. Thus, after thirteen years of struggle in the courts and after five years of total educational deprivation, Negro children returned this fall to the same segregated schools to which they or their older brothers and sisters were assigned in 1951 when legal proceedings were first initiated to end public school segregation. Surry County similarly attempts to circumvent the Brown decision by establishing and maintaining a separate and ostensibly private school system open to whites only.

True, in Prince Edward and in Surry, the newly established white schools are nominally no part of the .ounties' school systems, but they are in fact the counties' schools, supported by the counties and, indeed, tailor-made to continue their initially avowed and persistently pursued policy of segregation.

Not only are these Foundation schools supported almost entirely by public funds in the form of tuition grants, but their student bodies consist of those white children who previously attended the public schools, and no significant number comes from outside the respective counties.

The faculties of the Foundation schools consist of the teachers who formerly taught the same white students in the public schools. There is no evidence indicating that any white teacher remained in the public school system or failed to take a job in the Foundation schools. Under Virginia law the transfer to Foundation schools organized after December 29, 1956, involved no loss of retirement benefits available to them as public school teachers.[5] Furthermore, up until 1959 the recipient of a teacher scholarship from the State Board of Education had to satisfy his repayment obligation by teaching one year in a public school. Since that time, one year of teaching in a private school approved by the Board has been deemed adequate.[6]

Through these arrangements the counties offered additional inducements to public school teachers to transfer to segregated "private" schools without any sacrifice.

■ If such strategic maneuvers, resorted to in response to the law's requirement, pass muster, Prince Edward and Surry have indeed accomplished a remarkable feat, stultifying a decade of judicial effort to bring about compliance with Brown v. Board of Education. But the label applied to these Foundation schools cannot blind courts, or anyone else, to the realities. It is of no importance whether grants are made directly to Foundation schools or indirectly through the conduit of pupil subventions for restricted use as tuition fees. In the circumstances disclosed in the present cases there is a transparent evasion of the Fourteenth Amendment. See Lee v. Macon County Board of Education, 231 F.Supp. 743 (M.D.Ala.1964) (three-judge court). The involvement of public officials and public funds so essentially characterizes the enterprise in each of the counties that the Foundation schools must be regarded as public facilities in which discrimination on racial lines is constitutionally impermissible. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

■■ Our decision in no way conflicts with Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), which the officials cite as authority for the proposition that no First Amendment freedom may be "infringed by the denial of or placing of conditions upon a benefit or privilege." The defendants assert that injunctions preventing the use of tuition grants to maintain a separate school for white pupils will infringe the white pupils' "right of association." There is a right of association which the Constitution respects and protects. However, to invoke the right in the manner of Prince Edward and Surry

5. Virginia Code of 1950, as amended 1956, § 51.111.38.1.

6. Virginia Code of 1950, as amended 1959, § 23-38.1.

is merely to assert euphemistically a right to enforce involuntary segregation of the races in public facilities. This is precisely the claim which a unanimous Supreme Court has rejected in Brown v. Board of Education and in numerous other decisions. No First or Fourteenth Amendment freedom or other constitutional right is infringed by an injunction restraining the paying out of public grants to support a publicly operated segregated school system. The clear and unavoidable implication of the Brown decision is that white persons have no constitutional right to associate in publicly maintained facilities on a segregated basis. We do not deal here with the right of persons to send their children to segregated schools at their own expense.

■ The Prince Edward case is remanded to the District Court. Under different circumstances the most appropriate remedy would be to order the desegregation of the Foundation schools; however, in the circumstances of this case, we feel that the District Court should enter an order enjoining the defendants from processing or paying tuition grants to parents desiring to send their children to the Foundation schools as long as those schools remain segregated, or to any other segregated school that is, in effect, an extension of the public school system.

Left undecided by the District Court was the demand of the plaintiffs for an injunction against discriminatory practices in respect to faculty and other personnel assignments. We need not pass on the view adopted by the court that the pleadings did not explicity raise the question. We hold that the plaintiffs' motion of June 29, 1964, to modify the judgment order of June 17, 1964, may be treated as a motion for leave to amend the pleadings; and, as such, the motion may in the court's discretion be granted, or in the alternative the court shall permit a supplemental complaint.

The plaintiffs have standing to raise this question in both counties.

In the factual context disclosed, where the actions of the county officials were found to have been taken to evade and defeat the mandate of the Brown decision, Judge Butzner's injunction against the payment of scholarship funds was appropriate, and we affirm it.

The defendants point out that Judge Butzner's order could be understood to include in its sweep situations quite unlike these cases. It has been suggested that it could be read to forbid any form of payment for any purpose which might conceivably bring an incidental benefit to a truly private institution that may happen to practice discrimination to the smallest degree. Such of course is not the purpose or effect of the order, but to avoid all doubt Judge Butzner should amend his order, by directing it specifically to the present situation. Obviously, we leave future cases for decision when their facts are properly developed. What may be held to constitute or not to constitute state action and within the proscription of the Fourteenth Amendment "can be determined only in the framework of the peculiar facts or circumstances present." Burton v. Wilmington Parking Authority, 365 U.S. 715, 726, 81 S.Ct. 856, 862 (1961).

■ We affirm as well warranted Judge Butzner's ruling that the plaintiffs in the Surry County case are entitled to an award of counsel fees.

### IV.

Normally jurisdictional questions would be dealt with at the beginning rather than near the end of an opinion, but in this instance we have reserved the jurisdictional question till now because it can be discussed more conveniently and more briefly after the facts and other issues have been fully presented.

■ The defendants challenge the jurisdiction of the individual District Judges to decide the issues raised and hence the jurisdiction of this court to hear the appeals from their decisions. The argument is that the issues presented can be adjudicated only by three-judge district courts designated under 28 U.S.C.A. § 2281. We disagree. The plaintiffs do not attack the constitution-

ality of any state statute on its face; they contend only that the Virginia tuition grant statute is being applied in an unconstitutional manner in the two counties. The Supreme Court has ruled in Griffin v. School Board, 377 U.S. 218, 84 S.Ct. 1226 (1964), that a single judge district court has jurisdiction to hear and decide the merits of such an action. That the decision might have repercussions beyond the counties involved or that the resulting order will run to parties outside the counties does not defeat the single judge's jurisdiction.

> "[W]hat is attacked in this suit is not something which the State has commanded [the County] to do * * but rather something which the county with state acquiescence and cooperation has undertaken to do on its own volition, a decision not binding on any other county in Virginia. Even though actions of the State are involved, the case, as it comes to us, concerns not a state-wide system but rather a situation unique to [the] County. We hold that the single district judge did not err in adjudicating this present controversy." Griffin v. School Board, 377 U.S. 218, 228, 84 S.Ct. 1226, 1231–1232, (1964).

We hold that Judge Lewis and Judge Butzner had jurisdiction to entertain and decide the cases heard by them respectively, and it follows that jurisdiction to review their orders is lodged in this court.

### V.

Plaintiffs have moved this court to cite the Prince Edward County Board of Supervisors in contempt for distributing tuition grants during the night of August 4, 1964. The plaintiffs assert that the Board intended these nocturnal distributions to serve two purposes, payment of 1963–64 and 1964–65 tuition grants, each constituting a contempt of this court. It is first contended that the increase in the amount of the grants constituted an indirect reimbursement to parents for tuition costs incurred during 1963–64 in violation of the order of July 2 signed by Judge Bell. That order could not have been violated on August 4 since it expired on July 9 when Judge Lewis, with consent of the parties, entered his permanent decree enjoining payment of 1963–64 grants. From the consent order there was of course no appeal. When the payments were made, therefore, no appeal from Judge Lewis' order was pending, as Judge Bell's restraining order contemplated.

However one may describe the increase in the grants, it is undisputed that part of the August 4 payments was for the 1964–65 school year. Judge Haynsworth, showing the defendants the consideration of asking them for a stipulation that such funds would not be paid out pending appeal, did not enter an order to that effect himself. Therefore, the payment of the grants did not constitute a violation of a direct order from this court.

We do not now pass on the motion for a contempt citation, but remand to the District Court for further inquiry into the facts surrounding the payments. The precise circumstances will there be developed in detail, and we will then be in a position to determine whether a contempt of this court has occurred through a destruction of the res during the pendency of the appeal in respect to 1964–65 tuition payments.

Judge Lewis is also fully empowered to consider whether any of the defendants has committed a contempt of his order of July 9 by paying indirectly, as plaintiffs charge, 1963–64 tuition grants.

The cases are remanded for further action consistent with the above views.