Mary A. FRANKLIN et al., Plaintiffs,

v.

COUNTY SCHOOL BOARD OF GILES COUNTY and P. E. Ahalt, Division Superintendent of Schools of Giles County, Defendants.

No. 64-C-73-R.

United States District Court
W. D. Virginia,
at Roanoke.

June 3, 1965.

S. W. Tucker, Henry L. Marsh, III, Richmond, Va., for plaintiffs.

John H. Thornton, Jr., Woods, Rogers, Muse & Walker, Roanoke, Va., S. A. Martin, Robert L. Powell, Pearisburg, Va., for defendants.

MICHIE, District Judge.

This action was brought by seven Negro teachers and the Virginia Teachers Association, Inc., an organization representing Negro teachers throughout the state, against the County School Board of Giles County, Virginia (hereinafter referred to as the School Board) and the Division Superintendent of Schools of Giles County, Mr. P. E. Ahalt. The jurisdiction of this court is invoked under Sections 1331, 1343, 2201 and 2202 of Title 28 and Sections 1981 and 1983 of Title 42 of the United States Code.

The gist of the complaint is the allegation that the seven individual plaintiffs were denied re-employment as teachers by the defendants for the 1964–65 school session because of their race. The defendants, while denying that they discriminated against these individuals, acknowledge that the Fourteenth Amendment to the Constitution of the United States forbids discrimination on account of race by a public school system with respect to the employment of teachers.

Defendants on their part moved for summary judgment on the ground that the decision to refuse these teachers re-employment was wholly within the discretion of the school authorities. This motion was denied and an evidentiary hearing held at which the facts hereinafter stated were developed.

Giles County lies in the mountains of Appalachia on the Virginia-West Virginia line to the north and west of Radford, Virginia. Over the last fifteen years the County has experienced a gradual decline in population, recently contributed to by cut-backs in the work force of the Celanese Corporation, its principal employer, resulting from automation of the Celanese plant. The overall decline in population was matched by a leveling off and decline in the number of school age children.

P. E. Ahalt, the Superintendent, was appointed to his present position in 1953. The evidence shows that throughout the decade 1953–63 Mr. Ahalt was

faced with a considerable challenge in his efforts to upgrade and improve the quality of education for all of Giles County's children. A program of consolidation of the white schools was carried out and completed in 1962. Bond issues were fought, defeated and later passed, with many of the citizens in the remoter areas apparently resisting the closing of their local schools. Also throughout this period efforts were made to upgrade the quality of the schools which were provided for the County's approximately 125 Negro students. The evidence shows that during Superintendent Ahalt's term Giles for the first time provided facilities for the education of Negro high school students beyond the tenth grade, and that school building conditions were greatly improved. However, the evidence also shows that the County's facilities for Negro students, the so-called Bluff City Schools, were never sufficiently satisfactory to warrant accreditation and that the faculty was, by the Superintendent's own admission, below the standard of the other schools. Because of the very small Negro population of the County (some 400 out of a total of 17,000), Mr. Ahalt recruited actively, but experienced great difficulty in attracting, teachers to staff the Negro schools. He testified that his standards for accepting teachers for these positions were somewhat lower than the standards he used in screening new white applicants.

This dual school system with all of its difficulties was ended when in May, 1964, the School Board voted to abandon the Bluff City Negro schools as the result of the application of approximately twenty of the Negro high school students for transfer to the formerly all white high schools. Following the Board's decision, the individual plaintiffs were notified by letters from the Superintendent dated May 15, 1964 that their jobs had been abolished and that their services would no longer be needed. It is this dismissal which plaintiffs complain of, arguing that the decision of the Superintendent was motivated by consid-erations forbidden by the Fourteenth Amendment.

Mr. Ahalt has accepted full responsibility for the decision to discharge these teachers. He acknowledges that the decision was made only after "hours of meditation" and that he "had a lot of misgivings" as to what his procedure should be. No one can look into a man's mind and examine his thought processes. However, in the view which I take of this case, such delving is unnecessary. Mr. Ahalt has testified before me and appeared to be an excellent administrator dedicated to the best interests of the Giles County school system. However, while I do not question his allegiance, I am satisfied that his action deprived these teachers of their rights under the Fourteenth Amendment. Although I sympathize with a school administrator who has had this very thorny problem thrown upon him after what appears to have been a long and bitter battle over consolidation, my duty to assist in the transition from segregated to integrated schools requires that I direct him to re-examine his decision.

This case bears a definite factual and legal relationship to the case of Brooks et al. v. School District of City of Moberly, Missouri, 267 F.2d 733 (8th Cir.), cert. denied 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 151 (1959), which involved the discharge of eleven Negro teachers following the closing of the Negro schools in Moberly. The Court of Appeals there characterized as "unusual and somewhat startling" the school board's conclusion that of the 109 teachers in the school system before the closing of the Negro school (98 White and 11 Negro) all of the eleven Negro teachers were less qualified than any but four of the white teachers and that these 15 should be discharged. The court went on to uphold the district court's determination that the complaint should be dismissed saying:

" * * * we cannot say with certainty here that there was no substantial evidence to support the trial court's finding and conclusion that

the Board acted honestly pursuant to its rule in awarding the teacher contracts." Brooks et al. v. School District of City of Moberly, supra, 267 F.2d at 739.

The instant case involves a determination by the Superintendent of the Giles County School System that of the 186 teachers in the system prior to the closing of the Negro schools seven were less suitable for re-employment than the remaining 179 and that those seven were the seven Negroes. The question before me is whether in reaching this conclusion the Superintendent exercised his discretion in such an unreasonable, arbitrary, capricious or unlawful manner as to violate these teachers' rights under the Fourteenth Amendment.

In reviewing Mr. Ahalt's decision, the crucial period was between early March of 1964 when it first became known that transfers would be applied for and May 15, 1964 when the formal decision to discharge these teachers was announced. However, the actions taken as the result of the decision to close the Bluff City schools must be contrasted with the evidence in the record of prior policy in similar situations. In particular, the record shows that on a number of occasions throughout the period preceding the closing of the Negro schools consolidations of white schools were carried out and in each instance the white teachers whose schools had been closed were retained in the school system. The earlier abandonments indicate to me that the Superintendent had followed a policy of using teachers from the abandoned schools in other schools in the system because he viewed the system as basically homogeneous, by which I mean that in normal circumstances he would transfer teachers between the various schools to suit the needs of the system rather than considering the teachers in the abandoned schools as unemployed and potentially available for any openings that might occur in the other schools. There are other indications of this policy in the record. Teachers have been shifted from school to school when and as needed. This system of shifting faculty personnel must have been used widely in the school years immediately prior to and following the 1962–63 school year when thirteen elementary teachers were eliminated to remedy the overstaffing in the elementary schools which had resulted from the series of consolidations. In order to adjust to an overstaffed condition and then to readjust following the elimination of that problem the system and the faculty must have had a great deal of flexibility in assignments.

In view of this pre-existing policy, I believe that the Superintendent's stated policy with regard to these plaintiffs, i. e., to evaluate their right to continued employment in terms of the *vacancies* then existing in the other schools in the system rather than by comparison of their effectiveness with the other teachers in the system was too restrictive and its use in this particular instance resulted in a discrimination against these individuals. This is not to say that it is constitutionally required under all circumstances to make such an overall re-evaluation. However, the making of such an evaluation is strong evidence of good faith, see Brooks et al., supra, 267 F.2d at 736, and where, as here, the school board has carried on a policy of retaining teachers (although the result in one instance was admitted over-staffing) and has eliminated teachers only after evaluation of their qualifications in comparison with those of all of the other teachers in the system, it is extremely difficult to justify the standard used in this case in the absence of any evidence in the record which would justify a change of policy on other than racial grounds. The evidence established that the closing of the Negro schools necessitated a reduction in the teaching staff. Accepting the defendants' contention that the individual plaintiffs were not qualified for any of the positions opening up as the result of turnover, the Superintendent did not explain why these teachers were not evaluated and compared with all of the other teachers in the system who taught in areas in

which the plaintiffs could teach in accordance with his prior practice in making these decisions.

My conclusion that the scope and nature of the Superintendent's evaluation of these teachers was arbitrary and resulted in a discrimination against them makes it unnecessary for me to review at any length the evidence offered by the plaintiff that in fact there was never a real evaluation of teaching qualifications and that in deciding to discharge all seven of these teachers the Superintendent considered only the closing of the Negro schools. There is evidence from which such a conclusion could be inferred. The letter sent to the individual plaintiffs refers solely to the abolition of their jobs because of the closing of the Bluff City schools without any reference to an evaluation or to any possibility that they could be employed in the previously all-white schools. As the Superintendent must have been aware that there would be vacancies before the opening of the school year and as he could not then know exactly who would be available to fill these vacancies, his abrupt termination of the employment of these plaintiffs is suspect. It certainly must be contrasted with the termination of the thirteen white elementary teachers in 1962-63 who defendants stated in their brief then formed a "pool" against future needs.

Similarly, I will not review at length the parties' attempts to compare the respective qualifications of the individual plaintiffs and the fifteen new teachers hired by the Superintendent for the 1964-65 school year. It does appear that several of the individual plaintiffs were better qualified considering only their certifications and experience than some of the people who were subsequently hired. However, these new people were hired at various times both before and after the termination of the employment of the individual plaintiffs and there is no indication that the Superintendent ever made a comparison of the qualifications of all of these teachers before asked to do so at the hearing in this matter

by his attorney. In this factual posture there is nothing to be gained by the court's speculating upon the subjective qualifications of the individuals involved, except to note again that the finality with which the individual plaintiffs' employment was terminated, in light of the Superintendent's obvious knowledge that new teachers would have to be hired, reflects badly upon the basis for that decision.

Perhaps the most difficult problem to be solved in this litigation is how to remedy the discrimination against the individual plaintiffs. Involved is the difficult problem of weighing the interests of the teachers, all of whom have found other employment, against the possible detrimental effects of an order re-employing them upon the administration of the schools and the efficiency of their staffs. The problem of the Negro teacher in the predominantly white classroom has always been in the background in this litigation. The Superintendent's decision purportedly was not based upon a consideration of potential difficulties arising from this situation but only upon the qualifications of the individuals involved. Therefore, there could be no justification of his initial decision on these grounds. However, as some further action will have to be taken by him regarding these individuals because of the court's order in this matter, some discussion will help to serve as a guideline to his future decisions.

The courts of the fourth circuit have dealt before with the very closely related problem of integrating the teaching staffs of larger school systems as a proper means of putting an end to the operation of schools on a racially segregated basis. See, e. g., Griffin v. Board of Supervisors of Prince Edward County, 339 F.2d 486 (4th Cir. 1964); Jackson v. School Board of City of Lynchburg, 321 F.2d 230 (4th Cir. 1963); Christmas v. Board of Education of Harford County, 231 F.Supp. 331 (D.Md.1964). This court has in the past approved plans calling for the desegregation of teaching staffs as in the plan finally adopted by

the Lynchburg City School Board on March 10, 1964. The court of appeals has commended action designed to eliminate considerations of race in personnel actions of school systems. See Brooks v. County School Board of Arlington County, 324 F.2d 303, 306 (4th Cir. 1963). However, this court, in approving plans aiming at the eventual desegregation of teaching staffs, has been mindful of the problems to be overcome before a totally color-blind assignment policy can be put into effect and has left preliminary consideration of this matter to the school authorities. In its recent opinion in Bradley v. School Board of City of Richmond, 345 F.2d 310 (4th Cir. 1965), the Court of Appeals supports a cautious approach to this problem. The court at page 320 laid down the following the guidelines for the district courts:

"When all direct discrimination in the assignment of pupils has been eliminated, assignment of teachers may be expected to follow the racial patterns established in the schools. An earlier judicial requirement of general reassignment of all teaching and administrative personnel need not be considered until the possible detrimental effects of such an order upon the administration of the schools and the efficiency of their staffs can be appraised along with the need for such an order in aid of protection of the constitutional rights of pupils."

■ Potentially the reinstatement of these plaintiffs poses very similar problems to those raised in the Bradley opinion. Possible detrimental effects should be considered by the school authorities in the first instance before any decision is made to integrate teaching staffs. On the record before me this has not been done by the Giles County authorities and the remedy will afford them an opportunity to make this evaluation. However, mere possibilities of difficulty should not be used as an excuse to disregard the rights of the Negro teachers. The burden of integration must not be shifted to them alone.

■ What is required is an intelligent appraisal of the capacity of the individuals involved to perform their true function—to educate their pupils. The rights of the pupils to the best possible educational opportunity are of paramount importance. Bald assertions of incompetency to perform this function, however, are not substitutes for reasoned analysis of the individual situations and an unwillingness to experiment to test the validity of a conclusion may well be considered as an admission of the weakness of that conclusion.

■ Turning to the specific relief which will be ordered to remedy the discrimination practiced against these seven teachers this court is mindful of the admonition of the Supreme Court in Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) that courts are to be guided by equitable principles and that equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. The interests of the individual plaintiffs in this litigation would be best served by placing them as nearly as possible in the positions that they occupied immediately before their discharge. In this instance that would require that the Superintendent re-evaluate the teaching qualifications of these individuals in comparison with all of the other teachers in the school system. However, these individuals have all accepted other teaching employment and the record is by no means clear as to how many of these people would now accept jobs in the Giles County school system were they offered. Furthermore, for the Superintendent to attempt to reconstruct an entirely hypothetical situation as of the date of the discrimination or in the alternative to involve people employed since that date in a complete evaluation would result in a great burden upon him and the school system because of its unsettling effect on the present faculty who would

be potentially in danger of losing their jobs. I will not order such a review under these facts and the plaintiffs very reasonably have not insisted upon it.

What seems appropriate under the facts of this case is a general injunction against further discrimination in carrying out personnel practices by the school system coupled with a system of preferential hiring to protect the interests of the individual teachers. I will order the defendants to carry out the following procedure in employing new teachers for a period of one year from the date of the entry of the final order in this case.

■ Upon the occurrence of any vacancy in the teaching staff within this period the Superintendent will write to each of the individual plaintiffs who are certified or experienced in the area of the vacancy inquiring whether that individual would be available to fill the vacant position and would like to be considered for it. Should any affirmative replies be received, the Superintendent will be directed to consider the qualifications of that individual or individuals together with the qualifications of any other persons who have applied for the position. Should his decision be to offer the position to an applicant other than one of the individual plaintiffs, he is to notify the plaintiffs who have applied of his decision and submit a written statement of his reasons to this court as soon as possible. The court will then review his decision on the basis of his statement and either affirm his decision, in, which case an offer may be made to the applicant selected, or will ask him to reconsider if it appears that his action was arbitrary. Any such statement will of course remain completely confidential for the protection of the individuals involved. However, should this court affirm a decision of the Superintendent to employ someone other than one of the individual plaintiffs based upon such a statement, any plaintiff who has been denied re-employment may request a copy of the statement and a formal hearing at which to challenge the Superintendent's decision before this court.

This procedure, although involved, should prove little burden to the Superintendent in practice because of the few individuals involved and its short duration. By this procedure those of the individual plaintiffs who are interested in teaching in the Giles County School system will have the opportunity of receiving a re-evaluation of their teaching ability. They will not, however, be guaranteed a position if there are other teachers available who are better qualified. This variance from the plaintiffs' requested injunction seems clearly warranted in order to protect the interests of the pupils who are also innocent parties in this litigation.

Nothing heretofore said has attempted to distinguish the cases of Mary A. Franklin or Sylvia D. Austin from the other five individual plaintiffs. There was some testimony taken as to each of these individuals regarding their possible unsuitability for employment. However, as the Superintendent is being asked to review his conclusions as to five of the teachers should they express their interest in re-employment, there can be no harm in treating these individuals similarly. The record developed thus far as to the reliability of plaintiff Mary A. Franklin is not sufficiently detailed for the court to rule that she was not discriminated against. The Superintendent may have a different view of the importance of her indiscretion against a different background. There is also evidence that the plaintiff Sylvia D. Austin was notified as early as March of 1964 that her work was unsatisfactory and that her contract would not be renewed. However, there is nothing in the record before me to indicate how deeply the Superintendent was embroiled in the overall controversy when this decision was made and there seems no harm in directing him to reconsider her qualifications if she requests it by applying for a position which he has notified her is vacant.

■ The final prayer of the complaint is that the defendants be required to pay the plaintiffs' counsel fees incurred in

this litigation. Suffice it to say that this school board has not been unreasonable or obdurately obstinate. See Bradley v. School Board of City of Richmond, supra, 345 F.2d at p. 321. Quite the contrary, the school board has been extremely reasonable in its handling of this novel and difficult legal problem as has been its counsel. It follows, therefore, that no allowance for attorneys' fees should be made.